It appears that the plaintiff has argued that we are not entitled to qualified immunity because there are disputed issues of fact. This case does not rely on disputed issues of fact. However, what the plaintiff seems to do is cull the undisputed facts that favor them as opposed to all of the undisputed facts that is mandated by the United States Supreme Court. In addition, the plaintiff relies heavily on the district court's decision that a reasonable jury could find liability in this case, and that would foreclose the qualified immunity, which is far from true. District of Columbia v. Westby is a controlling case on this particular matter. First of all, with regard to the district court's decision that a jury could find that there's a constitutional violation, in the District of Columbia v. Westby case, the jury, after the judge denied qualified immunity, found liability that there was no probable cause. The circuit court agreed that there was no probable cause, denied a hearing en banc. They even found that there was clearly established law at the time that would inform the officers that there was no probable cause. However, the United States Supreme Court reversed the circuit court decision, finding that the officers were, in fact, entitled to qualified immunity. And the Supreme Court faulted the lower court for viewing the facts in isolation. Okay. So how did facts being viewed in isolation? Well, when you do not consider all of the undisputed facts... So what facts did the district court not consider? The district court did not consider in context both the undisputed facts with regard to whether or not Detective Jordan or Detective Short would have realized in the first case that the thousand dollars was exculpatory evidence, and secondly, in the context of the specific circumstances with regard to Detective Short, whether he would have known that Detective Osip was soliciting false information. Well, let's take them one at a time then. So with respect to the thousand dollars, I mean, the prosecution's theory of the case is that this is a burglary gone wrong that then results in a murder. If a thousand dollars is not taken, does that, I mean, the theory is that that undermines the notion that this was a burglary at all. Not the way it's framed by the plaintiffs. They craft their complaint indicating that the burglars would not leave behind a thousand dollars. But that's not the real question in this case. The question is whether or not Detective Jordan could have believed that the burglars actually found the thousand dollars and in fact decided, well, let's leave it behind and not take the thousand dollars, which when we deal with the totality of the undisputed facts, in this particular case, would Detective Jordan have known at the time that in fact the burglars knew it was there and left it? And that he certainly would not have. There are thousands, there are unlimited unknown facts about the thousand dollars. We know almost nothing about where they were, where they came from, how evident they were, how whether they were out in plain sight. We know nothing about all that. So doesn't this issue turn at least potentially on findings of fact about facts that aren't in the record that are not knowable to us? You're exactly correct in as far as after 40 years, no one knows where the thousand dollars was. That's true. Why doesn't that do this in the circumstance where we just say, well, we can't say there was error in this. This turns on fact finding, which is not what we do on this kind of interlocutory appeal. For the purposes of qualified immunity on the interlocutory appeal, we have to look at the mind of Stephen Jordan and what he knew at the time. What he knew was that he was one of the first people that responded to the scene of the crime. These are undisputed facts, and that he searched the house and did not find the thousand dollars. Thereafter, he went with a sergeant and photographed the house. The thousand dollars was not found. He knew there were other Milford officials that were looking through the house. He had no knowledge that they saw the thousand dollars. Then the state police and the state lab arrives, and the forensic scientists and the state police, over two days of examining the house and looking and collecting evidence, they did not find the thousand dollars. Detective Jordan, in his mind, would believe that that thousand dollars was hidden. And then what happens is Detective Graham, who's in charge of the forensic team, comes to him, and the crime occurred on December 1st or 2nd, comes to him on December 4th at 2.20 in the afternoon, gives him numerous pieces of evidence. At one point, the plaintiff's claimed dozens of pieces of evidence, but says, here's an envelope, a bank bag, with the thousand dollars and cash in it. And he does not identify this as evidence. He documents it as found property. He apparently states that he got it from somebody else. Neither of these people designated this as evidence at all, let alone exculpatory evidence. And therefore, in my mind, in Detective Jordan's mind, he would believe, well, why would they not identify this as evidence if it was evidence? Were they acting in bad faith? Did they have any motivation? Was there any purpose in doing it? Was there anything but their honest belief that they really did not believe that this was evidence at the time? So he merely follows their course. And it's plausible that he would do that because he had no reason to believe that this was evidence at all related to the particular crime in this question. But it seems like you're drawing inferences in favor of your client. And that's not something that happens at this stage of the proceeding. I mean, that's a fact finder can draw those inferences, but there might be other inferences to be drawn. And in the absence of facts that would allow to allow us to narrow the range of permissible inferences, it's not clear to me how the district court was supposed to resolve this without adopting your view of the facts. Well, I don't know if we're talking about semantics here with regard to whether it's inferences or what an objectively reasonable officer would have known at the time. And that's what I'm trying to say. What would? Put yourself in the shoes of the detective with all that undisputed evidence. Would he know that it was exculpatory evidence? You're saying it's an undisputed fact that several different searches, as you just described them, were conducted of the house, first by Jordan and then by somebody else and so forth, without discovering the thousand dollars. And in view of that, there is no reasonable inference that can be drawn with respect to Jordan that he would have thought of this thousand dollars as anything other than something that was not physically evident when the house was searched. That's absolutely correct. I mean, in order to have to find that he knew at the time that this was exculpatory evidence and there are no undisputed issues of fact that would convey that knowledge to him. Well, the fact that something, if it's a burglary and the fact is that valuable things were left behind, that would be relevant. And the notion is that a law enforcement officer would understand that might be relevant to the crime. Well, as a matter of practice, and the plaintiffs have not come forward with any clearly established law indicating that, nor any policy or procedure in law enforcement where law enforcement officers would go to a burglary call and have a documented list, an inventory of items that were left behind, because if they were left behind, the presumption is that there wasn't a burglary at all. There is no reason to believe that an officer under these circumstances would know that this was exculpatory evidence. And with regard to Detective Short, it's the same issue. Would he know that Detective Osip is trying to elicit false confession information at the time that he acted? This seems to me to be quite different because you say there was undisputed evidence that the $1,000 was not found in the house. But when we're talking about Short, there's no undisputed information to the effect that Short didn't know the impropriety of things that were being done by the other detective. I mean, it may be. This is really a complete blank, blank screen. We just don't know what the circumstances, we don't know what Short heard, what Short didn't hear, what Short was present for. Before the recorded interrogation, we don't know what Short knew about what had happened between Osip and the person being interrogated. So the same circumstances don't apply to Short as you were describing for Jordan. And in order to overcome the qualified immunity, you can't rely on speculation and conjecture as to what may or may not have happened. But Pacoccia testified in the state habeas, right? He was deposed and he said that the other detective basically told him what the conclusion that he'd drawn was as to who the murderer was and also allowed him to review the case file, right? Let's assume that his testimony 27 years later did indicate that. That the detective was down there and let's assume the detective said to him that I believe Birch committed the murder. Well, the whole reason that the police officers were summoned by Pacoccia to come down there is because I have information about a murder that Birch was involved in. So he knew that before they even arrived down in Norfolk. And the evidence that we have and the very best evidence, which is undisputed, is the tape and transcribed transcript. And what we have there is... But you're saying we're not allowed to consider Pacoccia's testimony in the deposition for the habeas? I mean, he says that Osip allowed him to review the case file, right? No, he did not say that. What he said is that the case file was in front of Detective Osip and he was able to read it. Now, when was it on the file? Well, if you read the transcript and listen to the interview, it is clear that they were in the interview room. Well, part of the transcription is what happened outside the interview room. And then you add to that what was in the interview room. And while they were in the interview room, they were there for four minutes and 33 seconds talking about concessions that he would get, consideration he would get for testifying. And before a single question is asked, you can see that on the transcript, he blurts out the confession that Birch gave him on the bus on the way down. How possibly would Detective Short know that just talking about considerations he would give would cause him to confess? And then the interview goes on and several times Osip mentions that it was an old man that was murdered. Common information, innocuous information. How would telling him that information lead to the second confession, which was not as significant when they were at the motel and he said, you don't have a murder to worry about. And those are the only incriminating pieces of what follows that. After the interview is essentially over, what Detective Osip says is, well, you got it wrong, it didn't happen in the daytime, it happened at night, and there were more than two suspects. How at that point would Detective Short have known that those undisputed facts would inform an officer that other detective is eliciting false confessions? He would not. And that is the linchpin of this. Well, Kochia says that he didn't know anything about the crime. He knew there was a murder and a burglary. He didn't know any specifics and everything he learned was at that proceeding because the file was opened right in front of him. That's what Kochia says. Why isn't that enough to lead a fact finder to conclude that this was a coached witness treatment and that this was being used to drum up charges against the defendants? Assuming he was allowed to read it, he certainly would not have garnered any information with regard to confessions within the first four and a half minutes that the tape recorder was going. But more significantly, he didn't adopt any facts of the case in the interview. He didn't adopt any facts in the file during the course of the trial. And at that point, you know, that was the end of Short's responsibility after the trial. And prior to 1989, there were no factually similar cases from the United States Supreme Court or the Second Circuit Court of Appeals that would have informed Detective Short that based on the facts that we're talking about right here and all of the other he should have realized that Ossoff was intentionally causing this witness to fabricate a confession. I'd like to go back to for a moment to the thousand dollars. You call it undisputed facts, the facts about these successive searches of the house having been conducted without discovering the thousand dollars. But now, are you contending that the plaintiffs in this case have agreed that that's true, that the plaintiffs have agreed that the thousand dollars that the house was searched two and three times without discovering the thousand dollars, or just that they haven't put forth information that could throw that into question? Well, they plead... Because if they just don't know, if they just don't know what the story was of when the house was searched and by whom and what was found and when and where, that's a little different from the accuracy of the proposition that Detective Jordan searched the house and never saw the thousand dollars. They do admit that he was there and one of the first people there. They do admit that there were other Milford officials there. They do talk about the state police and the forensic lab being there. They don't know what he saw when he searched the house or didn't see. That's the point. That the linchpin of this entire case is that there would have to be some knowledge on the part of the burglars there's a thousand dollars in this house and there is no evidence of that. You can't overcome summary judgment. You can't deny an officer qualified immunity on information that's unknown. Now we are presuming that the money was found in the house. Nobody even knows that, whether it was in the garage or the car, but we are going to stipulate because we have to accept that as an undisputed fact. It was someplace in the house, but the Counsel, to follow up on Judge LaValle's question of the recitation, because that struck me as well, the number of searches. Your statement of material undisputed facts says Mr. Jordan swept the house to ensure it was clear of suspects and other victims and assisted in taking photographs. I don't see anything else about searches in your statement of undisputed facts from the district court. So where is it coming from that these are I recall there being a couple of times it wasn't found, but I didn't recall it being six or seven, which is what it sounded like you were arguing. Okay. I think, again, we may be talking about semantics where I may be using the word search when you're going through and looking through the house. There's nothing in the I'm looking at the statement of undisputed facts. Those are the only mentions of going through or looking at or clearing or searching or inspecting. I'm not just looking at the word search. So where else am I supposed to look other than your statement of for this number of searches that allegedly a number of something visits that allegedly occurred without finding the money? Well, the fact, as you said, that he swept the house, that he went through the house. That's one sweep. Didn't see it. Right. Went through again. Well, where do we know that? How do we know that? Where is that an undisputed fact? That is actually in the pleadings. Okay. So you went through again. That's based on the of a verified complaint. So we're treating it as evidence that summary judgment. I cannot precisely identify what pleading it is, but it is undisputed that Sergeant Roma, along with Detective Jordan, went through the house and photographed the house. Okay. So that's a second set of people that went through. Right. And then we have the state police. Okay. I guess so the answer is it's not your undisputed statement of facts, but it's somewhere there and I should be able to track it down. Well, I think it's a matter of common knowledge that when police officers are going through a crime scene, they are looking through the entire crime scene. Counsel, we're at summary judgment and I'm really fond of the rules. And one of those is Local Rule 56 and Local Rule 56 tells us to do our statement of undisputed facts and I'm is answered, which is those other searches, reviews, clearances, inspections are not reflected in your statement of undisputed facts, but you believe that elsewhere in the record, we should be able to identify those things as undisputed facts. Yes. Okay. Would you say that there are two searches, two searches that are undisputed facts? Well, I would say more than that. I would say Detective Jordan's going through the house whether you call it a search or a sweep, the going through with Sergeant Roma to take photographs, you are looking at things in the house, maybe you won't call that or refer to that as a search. And there can be no dispute that when the forensic team comes in and the state police come in and they're spending two days there, they're not sitting back in a couch, they're looking through the house, which how can we not construe that as a search? But as to the first two, you say those have been, those were put forth in the Rule 56 statement and were not disputed? I believe... That the $1,000 was not seen... They were or they were in the pleadings. Will you reserve a minute for rebuttal, Mr. Spector? We'll now hear from Mr. Lebowitz. Good morning, Your Honors. May it please the Court, David Lebowitz on behalf of Plaintiffs Appellees. And I represent Mr. Birch, but we'll be presenting argument on behalf of both plaintiffs today. And I want to start on the jurisdictional question. This Court has repeatedly made clear, most recently in Judge Merriam's jock opinion just in March of this year, that an officer seeking to appeal the denial of qualified immunity on the basis of the collateral order doctrine has to accept the facts that the plaintiff alleges are true or that the district court found a reasonable jury could believe. And the purpose of that rule is to constrain interlocutory appeals like this one that are an exception to the ordinary final judgment rule and ensure that this Court does not undertake a full plenary examination of the record to determine whether inferences could support qualified immunity, but only looks at whether the facts as the district court concluded the jury could find them are sufficient to defeat qualified immunity. And I think it's important to note that does not mean, as appellants have repeatedly suggested both this morning and in their briefs, that they're permitted to accept only the facts that both sides agree are true and then draw inferences in their favor from those. They have to accept the facts that we allege are true even if they dispute them and argue from that premise that qualified immunity would obtain even under the facts as we allege them, which they have concededly not done. I think the discussion with Mr. Spector this morning is one that would perhaps appropriately take place in a jury room, but is not the kind of, you know, discussion that this Court hears on an interlocutory appeal of qualified immunity. And in fact, they've conceded in their brief, this is on page 39 of the opening brief, and this is a direct quotation, if Jordan knew the $1,000 was material exculpatory evidence and he intentionally suppressed such evidence, he would not be entitled to qualified immunity. Those are all facts the district court found the jury could reasonably believe. That ends the matter and deprives this Court of jurisdiction. However, in the event this Court wanted to look behind those conclusions, it's extraordinarily clear that there is sufficient evidence in this record from which a jury could conclude that this evidence was material and that it was intentionally or at least in bad faiths suppressed by the police. Well, there's three main sources of that information. The first is, the circumstantial evidence we do have supports the idea that the police considered the cash important. The form that Jordan completed said that it was seized in connection with a criminal case on December 3rd of 1985. And obviously, there would have been numerous items in the house that weren't missing or that weren't seized, but this envelope was thought significant enough for the police to take custody of. Then that same day that it's found, a state police detective travels from Central Connecticut to Bayonne, New Jersey, to interview Diana Colombo, who was the victim's daughter, and ask her about, according to the report, items at her home that may have been touched or removed because, quote, the crime scene processing crew at the scene had brought out points of interest that had to be addressed. That's at page 1194 of the Joint Appendix. And on that detective's notes and the list of those topics to discuss with her is the notation $1,000 found. That evidence is summarized at pages 1669 and 1670 of the Joint Appendix. Now, I think it's really important also to note here that the fact the cash was seized on December 3rd, which was the second day of processing of the scene, does not in any way suggest that it was any less important or less conspicuous than any other item of evidence or that it was somehow too hidden to have been seen by would-be burglars. The other evidence that Mr. Graham seized also on December 3rd included blood spatter from the walls, pieces of floorboard with bloody footprints on them, money from the pocket of the jeans of the victim that were found on his bed. All of that was documented by Mr. Graham as evidence in his report. So we know the fact that things were seized on December 3rd does not in any way mean that they were hidden. And we also know that this cash was found by the police when they were going through the house. We don't know exactly at which juncture or by whom because the self-serving statements of the police in this case claim that they don't remember. But of course the cash was found. It was seized just like all of this other evidence from the scene on December 3rd, and it was handed over to Mr. Jordan. Now, the parents are – Just one thing. The inference, though, that you're asking a fact checker to make is that if $1,000 was left behind, this couldn't have been a burglary. It must have been personal, and therefore they had the wrong guys. That's the theory. That's exactly right, Your Honor. And there was also jewelry left behind, right? There was jewelry that Ms. Colombo claimed was missing, but only her statements – her statements, as we detail in our brief, her behavior around the time of the discovery of her father's body and subsequently was very unusual and inexplicable and suspicious. Well, I thought there were a series of questions in the deposition about $1,000 in cash and $10,000 in jewelry that was left behind. I believe the $10,000 in jewelry was – and I apologize if I have this mistaken, but I believe the $10,000 in jewelry was a claim that – yes, but it's not totally clear from the notation, but the understanding is that there was $10,000 in jewelry that Ms. Colombo claimed she was missing and that the burglars may have taken. How much was left behind if she claimed it was missing? I'm confused. I don't have the testimony in front of me, so I apologize if I'm misstating this, but my recollection is that the $10,000 worth of jewelry was not something she claimed was – was not something that was found to have been left behind, but was something that was claimed to have been – to be missing. I do want to return to this issue, though, of the claim by appellants that this cash must have been hidden because Detective Jordan supposedly didn't see it during his repeated, meticulous searches of the house. And given what Mr. Spector has said this morning and in his brief, one could be forgiven for assuming that there's any factual basis whatsoever in the record for that assertion, but in fact, there's not. I deposed Detective Jordan. I asked him about this. At page 1142 of the joint appendix, he says – this is at page 191 of his deposition – I didn't do the processing. I have no idea. I didn't search the house for evidence. That was the state police, so I don't know. And then again, two pages later, I asked him, okay, it's your testimony. You don't recall ever discussing with anyone why the police had this money. Yes. You don't recall ever discussing with anyone why it was being returned to her the next day. Yes. So it's not at all – there's no basis in the record for this idea that the cash was hidden, that it was inconspicuous. It was found just like a bunch of other very conspicuous evidence during the scene – the processing of the scene, but treated very differently. And now, Jordan's position here is that this record proves beyond dispute that the cash was hidden and wouldn't have been seen by burglars, because that's their burden on qualified immunity at the summary judgment stage. But the district court correctly found that this is a jury question. Not only that, the district court specifically found that a factfinder could conclude he intentionally suppressed this evidence in bad faith. It's undisputed that by the time the cash was found, Detective Jordan knew that the working motive theory was this burglary gone wrong. That was the entire premise of the interview he conducted. But wouldn't a burglary gone wrong mean they left stuff behind? I guess I – I don't think this was what the district court relied on, and no one's really arguing it much here, but it seems to me sort of strange to say it's a burglary gone wrong that results in somebody getting killed, and they didn't have the forethought to take everything that was worth anything so that it looks like the who's house after the Grinch got through it. I don't understand why that's a plausible theory. Well, it's – the reason it's plausible in this particular case is because the physical evidence from the scene clearly demonstrated that whoever did perpetrate this murder lingered in the house after the murder, because there's bloody footprints on the stairs, in various rooms on both levels of the house. And so the idea, as the prosecutor presented it at trial, the quotation from the summation was the burglary continued after the bloodletting, that these people were so intent on burglarizing this home that not only did they break in to steal valuables, when they were confronted by the homeowner, they didn't flee, they engaged in a struggle, they killed him, and then they went on continuing to burglarize the house. So they – And if they left $1,000 behind, that whole theory comes crashing down? Well, it certainly is materially favorable to the defense that somebody – these – the only motive theory that was ever suggested for these two to have committed this crime against a stranger was because they were so intent on stealing valuables and taking things that they could use to get drugs or to support their lifestyle that they killed an elderly man during the course of this burglary and then continued to burglarize the house thereafter. And if that were true, it would certainly suggest in the mind of a fact finder, or reasonably could, that that is called into doubt by the fact that they left behind an envelope stuck with $1,000 worth of cash. And given all the other evidence that this could have been – all the other indicia that this could have arisen from a personal vendetta, which we go over in our brief, it would certainly support that theory and that alternative, you know, third-party culpability theory if the only motive theory that was ever suggested for our clients was inconsistent with something found at the scene. And I think it's important to note here, it was – according to New Milford Police policy, Mr. Jordan was supposed to write a report about this cash, regardless of whether it was considered evidence or not, and enter that into the casebook. He conceded he didn't. Graham and Detective Cordiero also didn't include the cash in their reports. Then Graham and Jordan meet on December 4th of 1985 to – for Graham to turn over to Jordan all of the evidence that was seized from the house. And everything that he discovered at the house and that was considered evidence in the case was documented on his report, except for this cash. And then later in the case, Jordan returns this other money that was found in the victim's jean pocket, and he completes the same type of receipt that he did for the thousand dollars. This was only $67, and it was returned to the victim's widow rather than the daughter. And that receipt does end up in the casebook. So we know that Detective Jordan knew how to document these kinds of things for the prosecutor if he wished to do so, but he specifically chose not to do that here. And this Court's precedent holds that where a constitutional tort includes a state of mind element, a subjective element, that circumstantial evidence of improper motive can defeat a summary judgment motion for qualified immunity, even where, as they suggest, the underlying conduct could otherwise be considered objectively reasonable. That's the Sheppard v. Bierman case, which we cite in our brief, and many others. And the district court here found that a reasonable jury could believe Jordan acted in bad faith. And so even if some – and I just – you know, all the evidence, the circumstantial evidence that I just summarized supports that conclusion. So it's clear that even if some naive officer could have made an innocent mistake and wrongly considered the cash to be unimportant, all the evidence here suggests that Jordan knew it was important, considered it important, and took affirmative steps to make sure that the prosecutor would not be apprised of it. And certainly, the fact that a jury could reach that conclusion is sufficient to defeat summary judgment here. I do also want to touch a little bit on the claims involving short and evidence fabrication. For purposes of interlocutory review, the defendants can't dispute that the jury could find that, A, before the transcribed interview even began, Ossoff told Kochia, quote, what the murder was all about. That's from page 587 of the joint appendix from Mr. Ossoff's deposition, that Ossoff I thought that was a little sneaky on your part, because in the very next page, he says, I didn't tell him anything about this. I mean, it seems to me that you're seizing on a clumsily worded statement and suggesting from that that a fact finder should confer – should infer that he told him all the facts about the – about the murder. Well, I think that that conclusion that he did tell him everything he knew about the murder is supported by the fact that Kochia said exactly that in his habeas testimony. I mean, look, what's – He didn't actually say what I think you're arguing. What he said is that he learned facts during the interview. He learned them from the file that he was able to look at, and he learned it from what the officers were saying. I don't think he says – and you tell me if I'm wrong about this – that – that Ossoff told him everything about the case and then told him to basically just parrot him. Well, he said, quote, everything I learned, he learned during that interaction. But he doesn't say that it was told to him and then he was told to just adopt it. There's nothing in Kochia's statement that says that, is there? Well, I think it stands to reason that if he didn't know anything going into this meeting with them and he comes out of the meeting – But he doesn't say he didn't know anything. He says he knew there was a murder and he knew it was a murder. Right, and that everything else he learned, including that it was a knife that took place in New Milford, that it was an old man. But he doesn't say that these guys – I mean, just to be fair, he doesn't say these guys came in here, told me what to say, and then told me to write it down. He's saying that he learned facts from the interview and then parroted them back. But he doesn't say that there was an explicit agreement to do this, does he? Well, I don't think we have to establish that there was an explicit agreement. You're making a joke. I think you're being fair, I guess, is what I'm saying. Absolutely. It seems to me you're being a little slick here with the record. I think, Your Honor, that the point here is that the record is more than sufficient to support an inference by a reasonable fact finder that Ossoff was conspicuously fabricating evidence while Short was sitting right there. He testified – Isn't it true that Ossoff interviewed Kochia before the recorded part? That there was a conversation between them prior to the recorded part? That's right. That's what Detective Ossoff – And there's no information about what Short was privy to or not privy to during that prior. Well, Ossoff's testimony was that Short was present during the entire interaction in Virginia with Mr. Kochia, that he was paying attention, that he had no indication that he missed anything. I mean, these two drove hours together down to conduct a joint interview. I think it's certainly a plausible inference on the part of a fact finder that Ossoff and Short were both present and both jointly engaged in this process for the entirety of whatever happened, which, according to Ossoff, included this unrecorded portion of the interview. And Ossoff, in real time, we know from the transcript, is changing Kochia's story for the purpose of inculpating Mr. Burge. He tells him the victim was an old man. He tells him that the murder was a stabbing. He tells him the murder was in New Milford. And then Kochia incorrectly claims it happened during the daytime. Ossoff corrects him and tells him it was at night. He incorrectly claims that Mr. Burge told him he was in the house alone. And Ossoff corrected him and tells him that actually there was more than one person involved. Those facts are more than sufficient for a jury to find both fabrication and knowledge of the falsity of Kochia's story on the part of both Ossoff and Short. And it's clear, there's no dispute, that there were no steps taken to intervene on Short's part to prevent the deprivation of liberty based on the fabrication. Their response that Kochia didn't adopt these facts in, you know, the statements he made subsequently, I think, is irrelevant, but it's also incorrect. His written statement, which the prosecutor considered indispensable for probable cause, includes the murder weapon being a knife, the location being in New Milford, things that Kochia testified and which are clear from the transcript, facts that Ossoff supplied to him while Short was sitting there. And then at trial, at Mr. Burge's criminal trial, when he was cross-examined, Mr. Kochia attempted to claim he'd always known the facts that, in fact, Ossoff said to him. That's at pages 206 to 207 of the record. But even if it were true that he didn't repeat all this fabricated information, it wouldn't absolve Short of culpability for, you know, making use of a witness whom he knew lacked any independent knowledge and whose knowledge came from the police. And because those are all plausible inferences that, you know, a fact finder could find, there's clearly no basis for qualified immunity. And more importantly, because the district court found that the jury could so conclude, there's no basis for the exercise of this Court's jurisdiction, and this appeal should therefore be dismissed. I know I'm well over my time, so I'll rest there unless the Court has further questions. All right. That brings us to Mr. Spector for a minute of rebuttal. The plaintiff is arguing that the Court found that a reasonable jury might find liability, but that's not the question here. The question on qualified immunity requires the perspective with regard to the knowledge that the officers had and would an objectively reasonable officer believe or know that he was violating constitutional rights. With regard to Jordan, he knew it was exculpatory evidence and didn't turn it over. With regard to Short, he knew it was fabricated evidence, but he didn't intervene. That is not the issue here. We look at the totality of the undisputed facts and determine whether or not an objectively reasonable officer would have had those beliefs and understanding that he's violating constitutional rights. Now, with regard to the most important point, I believe, is I was waiting for the plaintiff to come up with any clearly established law with a factually similar circumstance from the Second Circuit Court of Appeals of the United States Supreme Court that would put an officer in these circumstances on notice that they're violating constitutional rights. That alone should entitle the officers to qualified immunity. By the way, you think that a reasonable officer wouldn't understand you're not supposed to feed information to a witness who claims to have received a confession from a defendant? I don't. I certainly do not believe that a reasonable officer would know that providing innocuous information like the nighttime versus the daytime. Why is that innocuous? Wait, wait. Why is that innocuous? Because it was after the confession. That's the first thing. He was just having a casual conversation. Plus, during an interview. How is that innocuous? I mean, if his statements are inconsistent with the facts that are known by the officers and would be known by the jury, that would seem to be a pretty important thing. That would suggest he's either making it up or he has a bad memory. Or he didn't read the file, as he claimed he did. Because if he read the file, he'd know it would happen at daytime and there was more than one person outside of virtue. I guess. But I mean, what you're arguing is that an officer wouldn't know that conducting an interview with your file open so that the witness can review what you've got here and then asking him what he heard would be improper. That's your view? We've got to find a case on all fours with that? Or otherwise, qualified immunity is required? Not on all fours with that particular issue. But what is the incriminating evidence here? Assuming that this is truth, that Cochia, 27 years later, is telling the truth about that. As I said, in the four and a half minutes. We have to assume that he's telling the truth about this. We are assuming that he's telling the truth. But in the four and a half minutes, he's sitting there at a desk. The file is open. And he creates this confession that's supposed to be a fabrication. Why would an officer know that the person who's leaving the notebook open caused this individual to create that confession? Why would Short have possibly believed that was the case? Certainly, well, isn't that notebook? It seems to be a fair inference to be drawn from the facts that we have to assume to be true. Cochia's statements would support an inference that everybody in the room knew exactly what was going on. Okay. And what I'm saying is, we're assuming that the notebook is open and he could read it. Yeah, yeah, because that's what Cochia said. Okay. But how does that relate to him before a single question is asked, reporting the confession information, which was the incriminating information? How could he possibly know? Okay, you've got your notebook open. So this guy's going to make up a story. That's not what Cochia said. Cochia said he didn't know the key facts until after he met with and spoken to the agent. They detected. But he didn't relate any key facts. The confession only related to the bus ride down and Bert saying he committed a burglary and stabbed a man and killed him. That's the only thing he said in the first four minutes and 30 seconds. That's the incriminating evidence. That's what we're talking about here. Okay. And somebody watching this... After the fact. I mean, you're skeptical of Cochia and perhaps with good reason, but it seems to me at this stage of a proceeding, we have to take his version at face value. And he says he didn't know this stuff until the agents, the detectives gave it to him. All right. And you're saying that's contradicted by the audio tape? I believe it is. Because the audio tape shows the confession information coming out, you know, allegedly when that book is open for less than four minutes, because the whole tape was four minutes and 33 seconds at that point. But there's also then at least some evidence about conversation that took place before the tape recorder was activated. And that's all speculative. We don't know. What we do know... It's not all speculative. Cochia acknowledges much too, doesn't he? He says he, at most, he told him about the crime, that there was a murder that Bert was involved in, which was the whole reason they were brought down. And what is more significant is it's undisputed that he wasn't willing to give any information and the police detective stood up to leave. So he wasn't giving any information at that point. And he said, no, let's stay. Now, significantly with regard to the bloody footprints and plainly, would only a plainly incompetent officer know that there was exculpatory evidence because the burglar stayed for a certain period of time in the house? Well, I think that was answered by Judge Sifraza, and not that his ruling is controlling. But when he looked at the facts of the case, he found that a reasonable officer, you know, wouldn't have believed that it was exculpatory. And he rejected that claim. He is not a plainly incompetent person. The other three officers that knew about the $1,000 afterwards, they are not plainly incompetent people. Based on the facts, they believe that this was truly not exculpatory evidence. Plaintiff mentioned on page 39 that Jordan admitted if he knew that it was exculpatory evidence, he would have a responsibility to turn it over. But he did not know that it was exculpatory evidence for all of the prior argument that we've had here today. Uh, why did Graham turn over the $1,000 in cash? He said in his deposition, he turned it over because he wasn't going to leave the $1,000 floating around. So when that person found it, he thought it was important to give it back. And what did he do? He made out the inventory slip. He gave it to Jordan. And Jordan did document on a return receipt that he gave the money to the victim's daughter. So there was documentation.